1   Venkat Balasubramani (SBN 189192)
    FOCAL PLLC
2   800 Fifth Ave, Suite 4100
    Seattle, WA 98104
3   Phone: (206) 529-4827
    Fax:    (206) 260-3966
4   Email: venkat@focallaw.com
    Attorneys for Plaintiff
5   PETE MORICI

6

7

8                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
9                         SAN JOSE DIVISION

10  PETE MORICI, an individual,              Case No. 5:14-cv-00087-EJD

11                Plaintiff,                 FIRST AMENDED COMPLAINT FOR
             v.                              DAMAGES, RESTITUTION AND
12                                           INJUNCTIVE RELIEF
    HASHFAST TECHNOLOGIES LLC, a
13  California limited liability company,    (1) Breach of Contract
    HASHFAST LLC, a Delaware limited liability   (2) Fraud
14  company, SIMON BARBER, an individual,    (3) Violation of Cal. Bus. & Prof. Code §§
    and EDUARDO deCASTRO, an individual,         17200, et seq.
15                                           (4) Declaratory Relief
                  Defendants.
16                                           **JURY TRIAL DEMANDED**

17

18

19

20      Plaintiff Pete Morici ("***Morici***") alleges for his complaint against HashFast Technologies

21  LLC, HashFast LLC, and the principals of HashFast (collectively "***HashFast***") as follows:

22                            **INTRODUCTION**

23      This is a lawsuit seeking to enforce Morici's right to a refund for a product ordered from

24  HashFast that was not delivered in a timely fashion. The product in question—the "BabyJet"—

25  is computer hardware configured specifically to mine Bitcoin digital currency. Bitcoin mining

26  hardware loses value daily due to the ever-increasing computing power necessary to mine the

27  same amount of Bitcoin. Consequently, the date of delivery was one of the critical terms of the

purchase.

In August 2013, prior to placing his order, Mr. Morici viewed statements indicating that HashFast had already begun production of BabyJets, that HashFast currently had BabyJets "in stock", and that BabyJets would be shipped to customers in mid-October 2013. The statements were made by HashFast CTO Simon Barber and HashFast CEO Eduardo deCastro, via the HashFast website, and by HashFast representatives under the direction or supervision of Barber and deCastro. However, at the time the statements were made, Barber and deCastro had already negotiated a contract with a third party manufacturer of a chip to be included in BabyJets under which the agreed production timeline precluded completion of any BabyJets before mid-November 2013, at the very earliest. Barber and deCastro made, and directed these statements to be made, in order to encourage customer orders, which would provide HashFast the capital it needed to fund development of the BabyJets. But HashFast never had any intention or capability of timely performing.

Subsequent to Morici placing his order, HashFast representatives made further assurances to Morici and other customers on multiple occasions that delivery would occur in October 2013. These assurances induced Morici to delay seeking a refund of the amounts he paid. HashFast failed to make timely delivery. Instead, HashFast notified Morici on October 23, 2013, that delivery would not occur until mid-November. However, on November 7, 2013, HashFast again changed its delivery date, notifying Morici that delivery would not occur until mid-December. Upon receiving HashFast's November notification, Morici cancelled his order and requested a refund of the Bitcoin he paid to HashFast to purchase the product.

Despite repeated requests, HashFast has failed to offer Morici a full refund, likely due to the fact that between the time Morici paid for the product and when he sought a refund, the value of Bitcoin has increased dramatically. HashFast, Barber and deCastro should not be unjustly enriched as a result of its improper actions and the change in value of the Bitcoin. Morici should be entitled to a refund, and this refund should be tendered in Bitcoin (*i.e.*, the number of Bitcoin that Morici tendered to HashFast). This result is mandated both by the

relevant legal principles and equity, and by the understanding of the parties. HashFast, Barber, and deCastro have engaged in a systematic campaign of stringing along its customers and making misleading statements and should not be allowed to profit from their improper conduct. To the contrary, they should be required to disgorge their ill-gotten gains.

### THE PARTIES

1.     Morici is a resident of, and domiciled in, the State of Maryland.

2.     On information and belief, HashFast Technologies LLC is a limited liability company organized and existing under the laws of the State of California, and HashFast LLC is a limited liability company organized and existing under the laws of the State of Delaware. The companies, which on information and belief are closely affiliated, or alter-egos for one another, both have their principal places of business in San Jose, California.[1]

3.     On information and belief, Simon Barber and Eduardo deCastro are both California residents, founders, members, controlling owners, and officers of each of the HashFast entities. Barber has been the CTO of HashFast since its formation in 2013 and CEO and President of HashFast since May of 2014. Eduardo deCastro was the CEO of HashFast from its formation in 2013 to May 2014. After resigning from his position as CEO in May 2014, deCastro moved into a sales and marketing position at HashFast with no corresponding change in salary.

4.     At all times mentioned herein, defendants, and each of them, were an owner, a co-owner, an agent, representative and/or alter ego of their co-defendants, or otherwise acting on behalf of each and every remaining defendant and, in committing the acts hereinafter alleged, were acting with the course and scope of their authorities as an owner, co-owner, agent, representative and/or alter ego of its co-defendants, with the full knowledge, permission and consent of each and every other defendant, each co-defendant having ratified the acts of the other co-defendants.

---

[1] Both HashFast entities are currently in bankruptcy proceedings, and any proceedings as to them in this Court are currently stayed. Morici does not allege any new claims against the entities, but leaves any previously pled claims in place.

5.      Wherever appearing in this complaint, each and every reference to defendants, or any of them, is intended to be and shall be a reference to all defendants hereto, and to each of them, unless said reference is otherwise specifically qualified.

### JURISDICTION AND VENUE

6.      HashFast Technologies LLC is subject to personal jurisdiction in the State of California because it is a California limited liability company having its principal place of business in San Jose, California, and it is engaged in systematic and continuous contacts with the State of California by virtue of its business activities here. HashFast LLC is also subject to personal jurisdiction in the State of California because it has its principal place of business in the State of California and is engaged in systematic and continuous contacts with the State of California by virtue of its business activities here.

7.      The principals of HashFast are likewise subject to jurisdiction in the State of California either by being residents of the State of California, or by reason of their extensive contacts with the State of California, in the form of HashFast-related activities. Alternatively, to the extent there is no general jurisdiction over the principals of HashFast, they have purposefully aimed their conduct to the State of California, through their activities with HashFast, and should reasonably expect to be sued in the State of California.

8.      The Court has jurisdiction over the subject matter of the dispute under 28 USC § 1332. Morici and the HashFast entities and principals are citizens of different states and the amount in controversy exceeds seventy five thousand dollars ($75,000.00).

9.      Venue is proper in this judicial district under 28 USC § 1391(b)(1) and (2) because HashFast is based in this judicial district and, alternatively, because a substantial part of the events or omissions giving rise to the Morici's claims occurred, or a substantial part of the property that is the subject of the action is situated in this judicial district.

### FACTS

**BITCOINS BACKGROUND**

10.      Bitcoin is a peer-to-peer payment network that uses digital currency known as

"Bitcoin" (abbreviated as "BTC"). The Bitcoin network is decentralized, with no authority overseeing its operation, and uses open-source encryption software for transactions. Every Bitcoin transaction is permanently recorded and is maintained in a transparent public ledger. The original technical paper describing Bitcoin can be found here: http://bitcoin.org/bitcoin.pdf.

11.     Payment transactions are processed by a network of private computers distributed throughout the world which, typically, have been specially configured for processing Bitcoin transactions. These computers are commonly referred to as "Bitcoin computers," and the operators of such computers are known as "miners."  Miners are partially compensated for the work they perform by receiving fees for the Bitcoin transactions that they process through their Bitcoin computers.

12.     The Bitcoin system also incentivizes miners to process transactions by allowing miners to create new Bitcoins for themselves based on the number of "blocks" discovered. Blocks are files containing data regarding Bitcoin transactions that have yet to be recorded in the public ledger. The process of discovering a block involves calculating a SHA256 hash, an algorithm that is very difficult to solve, over and over again until the miner finds an input that matches an expected output. The chance that a miner will discover a given block, and thereby claim its Bitcoin "reward" before another miner, are based on the miner's hash rate relative to the total hash rate of all Bitcoin miners on the network. This incentive creates an inherent competitive environment in which miners seek to increase their rate of processing. Consequently, miners are constantly looking to increase the processing power of their Bitcoin computers. Thus, acquisition of the latest technology is crucial for miners, and to those who purchase and sell Bitcoin mining equipment, the timing of shipment is inherently important.

13.     The difficulty of Bitcoin mining is continually adjusted based on the rate at which blocks are created. Thus, as competition increases, so does the difficulty in processing. As a result, a Bitcoin mining computer continually becomes less valuable over time, as it becomes relatively less efficient at processing Bitcoin blocks. Eventually, without upgrading technology, the electricity required for processing will cost a miner more than the Bitcoin

computer is able to generate.

14.     As the adoption of the Bitcoin system has increased, technology companies have sprung up to serve the Bitcoin mining market, developing specialized computers to conduct Bitcoin mining. HashFast is one such company.

15.     Bitcoin value fluctuates based on supply and demand. Importantly, the Bitcoin system includes a cap on the total number of Bitcoins that will be made available—21,000,000 Bitcoins. Currently, the number of Bitcoins in circulation is approximately just under 14,000,000.

**HASHFAST BACKGROUND**

16.     HashFast was an operation set up by Barber and deCastro, the original founders. They set up two HashFast entities: HashFast LLC, which would hold the intellectual property, and HashFast Technologies which would conduct business operations.

17.     The two HashFast entities were treated interchangeably, and Barber and deCastro did not meaningfully distinguish between the two—*i.e.*, one would pay the debts and liabilities of the other and there was no agreement or roadmap in place that spelled out which entity was responsible for which obligation. Nor did the two HashFast entities have written documentation that governed the material aspects of their relationships with one another.

18.     Together, Barber and deCastro exercised control over all aspects of HashFast's operations (through being majority equity owners and otherwise having veto power over corporate decisions). Both were intimately involved in the daily operations of HashFast, including, but not limited to: the raising of operating capital; procurement of material; setting production and distribution schedules; negotiating contracts with third party vendors; and overseeing and implementing marketing plans. They tracked vendor activity closely, making joint decisions to approve invoices and designating which HashFast entity paid the invoices. Barber and deCastro also managed and directed the efforts of over forty employees. They had knowledge of supply chain timing for BabyJet components because they managed all of the engineering resources; reviewed work and approved invoices.

19.     Barber's specific knowledge of HashFast's business activities was not incidental. In fact, prior to the formation of HashFast, he mapped out its technological, sales and marketing strategies and was directly compensated by HashFast LLC for generating the bitcoin mining business plan.

**UNDER-CAPITALIZATION AND SALE OF PRODUCT TO FUND DEVELOPMENT**

20.     HashFast was capitalized with a total of $641,643 USD, a number that was totally inadequate to undertake production and development of Bitcoin mining equipment (which would cost several millions of dollars). However, Barber and deCastro sought to solicit customer orders for Bitcoin equipment, and using the funds received from customers, pay vendors and other third parties who would ultimately produce the machines. Barber and deCastro caused HashFast to engage in an extensive marketing campaign promising delivery of BabyJet machines by dates certain, knowing that they could not meet the delivery deadlines for the machines.

21.     HashFast engaged in a wide range of promotion via Bitcoin Talk, a message board popular with the Bitcoin mining community and in other fora online. HashFast promotion included (1) inviting members of the Bitcoin mining community to visit their offices, (2) announcing partnerships and supply arrangements, and (3) stating that their order process would be fully transparent. For example, in late August, HashFast purported to "announce some specs for [HashFast's] mining chip," going so far as to attach a letter from a third party partner. HashFast said that it would also be open and transparent about its sales queue. Despite these public assertions of transparency, HashFast never disclosed to customers that (1) it could not deliver and (2) that third parties were being paid to make statements publicly endorsing HashFast and confirming the purported BabyJet delivery timeline.

22.     Barber and deCastro both individually posted on Bitcoin Talk, both initiating messages, responding to the messages of prospective customers and others, and generally participating in conversations on that forum. In 2013 alone, Barber amassed approximately 42 posts and deCastro 7 posts. They also posted to the blog maintained on the HashFast website.

23.     HashFast actually paid at least one third party, Marc A. Lowe (a/k/a "***Cypherdoc***,"), to promote HashFast on the Bitcoin Talk forum and elsewhere, including specifically to quell customer concerns regarding HashFast's ability to deliver. Lowe met with both Barber and deCastro at the HashFast offices to discuss the BabyJet and its production timeline. On August 7, 2013, a Memorandum of Understanding ("***MOU***") between HashFast and Lowe was signed by Eduardo deCastro (on behalf of HashFast), under the terms of which Lowe was to receive 10% of the gross proceeds from the sale of the first 550 BabyJets in return for endorsements of HashFast and its products. Under the direction of Barber and deCastro, Lowe made numerous false assurances regarding BabyJet delivery dates but did not post disclosures along with his marketing statements that would alert prospective customers that he was being compensated for his endorsements.

24.     Barber also directly supervised John Skrodenis, HashFast's head of sales, who similarly made numerous marketing statements and assurances that were false and misleading.

**DEVELOPMENT OF THE G1 CHIP**

25.     In June of 2013, HashFast, through Barber and deCastro, began to negotiate a contract with Uniquify Inc. ("***Uniquify***") for design and production services related to the "G1" or "Golden Nonce" microchip that was to be used to power the BabyJet. Prior to the signing of the contract between HashFast and Uniquify, Barber and deCastro each participated in numerous and detailed discussions with Uniquify about production specifications and delivery timeline for the G1 chip. As a result of their discussions with Uniquify, both Barber and deCastro had full knowledge of the amount of time necessary to create the G1 chip and, consequently, the date on which BabyJets could be made available.

26.     On July 1, 2013, Barber signed a Statement of Work agreement ("***SOW I***") which specifically stated that, even with an expedited production schedule, the G1 chip would not "tape-out" until September 15, 2013 (*i.e.*, Uniquify would not present the first complete design for the chip until that date). At the time Barber signed the SOW I, Barber and deCastro were informed by Uniquify that, even with an expedited production schedule, the time between

tape-out and a finished product would exceed two months.

27.     Due to their negotiations with Uniquify and the resulting SOW I, Barber and deCastro knew that they would not be able to provide BabyJets until, at the earliest, sometime in mid-November 2013. Indeed, HashFast and Uniquify shared office space and other resources, and Barber and deCastro had personal knowledge regarding whether HashFast would be able to meet its promised deadlines. Despite this knowledge, they made pointed assurances to prospective customers, including Morici, that the delivery date would be earlier than was possible. In fact, they engaged in a wide-ranging marketing campaign designed to assure prospective customers regarding their ability to timely deliver, all while knowing that such delivery was impossible.

**FALSE STATEMENTS MADE TO MORICI THAT INDUCED HIS ORDER**

*False Statements on the Bitcoin Talk Forum*

28.     Like many members of the Bitcoin community, Mr. Morici was a participant in the internet message board and community known as Bitcoin Talk.

29.     On July 18, 2013, Barber personally and actively participated in the public marketing plan for the BabyJet by posting a link on the HashFast website to a "Status Report" written by Uniquify regarding the G1 chip. A link to this posting can be found here: <http://hashfast.com/uniquifystatemen/>. A screenshot of this statement is attached as **Exhibit A** hereto. The "status report" was written at the request of Barber and deCastro and intended to convey to prospective customers that the production of the BabyJets would be ahead of schedule.

30.     A HashFast representative, acting under the direction or supervision of Barber and deCastro, publicly posted statements that shipments of the BabyJet would be made in late October. On August 5, 2013, the following statement was posted to Bitcoin Talk: "We will be shipping [the mining product] in October."  A screenshot of this statement is attached as **Exhibit B** hereto. A screenshot of this statement may also be viewed at: https://bitcointalk.org/index.php?topic=262052.msg2869011#msg2869011.

31.     On August 8, 2013, Barber himself posted that "HashFast is launching sales of the BabyJet [mining product]," and further stated "Shipments begin: October 20th-30th . . . ."  A screenshot of this statement is attached as **Exhibit C** hereto. A screenshot of this statement may also be viewed at: https://bitcointalk.org/index.php?topic=270384.msg2894615#msg2894615.

32.     On August 8, 2013 on behalf of HashFast, and at the direction of deCastro, Lowe posted repeated assurances that HashFast would meet delivery deadlines and would "...offer full refunds by the end of the year if they're late" on BitCoin Talk Forum. Barber confirmed these assurances on the same day by posting in a Cypherdoc generated BitCoin Talk forum thread that: "this is true." A screenshot of this statement is attached as **Exhibit D** hereto. A screenshot of this statement may also be viewed at:

https://bitcointalk.org/index.php?topic=270363.msg2894452#msg2894452.

33.     At the time the foregoing statements were made, Barber and deCastro were aware that delivery in October was impossible given the timeline for development of the G1 chip agreed to in the Uniquify SOW I. Despite this, Hashfast employees acting under the direction or supervision of Barber and deCastro, made the false statements on Bitcoin Talk. Barber and deCastro knew that the false statements would induce potential customers, including Mr. Morici, to purchase BabyJets, and the statements were made for that purpose.

*False Statements Made via HashFast's Website*

34.     HashFast operates a website located at http://www.hashfast.com (the "***Site***"). HashFast describes itself on the Site as a "leader in Bitcoin mining technology."  *See* http://hashfast.com/about-us/. The domain name <hashfast.com> is registered to "Edward deCastro" and he had express control over the statements posted on that website.

35.     On August 10, 2013, Mr. Morici visited the Site in the course of deciding whether to order a Bitcoin mining computer from HashFast. At that time, the Site advertised (1) that HashFast had precisely 503 of 550 BabyJet units "in stock," and (2) that shipments of BabyJets would occur by October 2013. These statements were false, as the G1 chip which was to be used in the BabyJets had not even been fully developed at this time. The statements were

authorized by Barber and deCastro, who knew that the false statements would induce potential customers, including Mr. Morici, to purchase BabyJets, and the statements were made for that purpose. Indeed, given that Barber and deCastro had unique knowledge within the company of the delivery timeline and availability of the BabyJets (*i.e.*, they were the only HashFast employees with the authority to negotiate and sign third party contracts, review vendor work product and approve invoices) such statements could only have originated with them or have been made by them or at their direction.

36.     After reviewing the product information provided on the Site for HashFast's "BabyJet" Bitcoin mining computer, including the product's technical specifications and HashFast's stated delivery dates, Mr. Morici decided that he wished to purchase the BabyJet.

37.     In choosing the BabyJet, Mr. Morici relied on the above representations regarding the availability and delivery dates of the BabyJets. A screenshot of the webpage on the Site that was substantially similar to what was viewed by Mr. Morici at the time of placing his order is attached as **Exhibit E** hereto. Nothing on the product page indicated that there was any uncertainty as to the current availability of the product or HashFast's ability to ship the product in a timely fashion.

*False Assurances Made Over the Telephone*

38.     Although the Site contained functionality that allowed online ordering, on the date Mr. Morici visited the Site (August 10, 2013), the Site was unavailable to process orders. Therefore, Mr. Morici contacted Hashfast that day, and in response, John Skrodenis, Vice President of HashFast, instructed Mr. Morici to place his order manually (by telephone and email). In an email to Mr. Morici, Mr. Skrodenis offered "free shipping."

39.     In a subsequent telephone conversation with Mr. Skrodenis that same day, Mr. Morici specifically raised the question of whether HashFast's advertised delivery dates of October 20-30 were firm, and whether there was any possibility that HashFast would not meet its advertised dates. Mr. Skrodenis, under the direction of Barber and deCastro, was emphatic in assuring Mr. Morici, saying: "that is not going to happen."  Again, given that Barber and

1    deCastro were the two people in the company that had knowledge regarding delivery dates, this

2    information would have originated with them.

3          40.    The above statements were made at the direction of Barber, who exercised

4    supervisory authority over Skrodenis.

5                *Morici's Reliance on False Statements*

6          41.    Later that day, per Mr. Skrodenis' instructions, Mr. Morici placed an order with

7    HashFast for two (2) BabyJets at a total cost of $11,200 USD. Despite Mr. Skrodenis' promise

8    of free shipping, HashFast also charged Mr. Morici $307.38 USD for shipping, making the total

9    transaction cost $11,507.38 USD. Payment on the transaction was to be made in Bitcoin, with

10   the cost amounting to 107.692308 BTC for the BabyJets, 2.95557692 BTC for shipping, for a

11   total of 110.67773274 BTC.

12         42.    HashFast stated in public posts on Bitcoin Talk that it would have credit card

13   processing available, but at the time Mr. Morici and numerous others placed their orders, the

14   only payment option made available by HashFast was in BTC. Had credit card processing been

15   made available by HashFast, Mr. Morici would have opted to pay using his credit card.

16         43.    Neither the applicable terms of purchase, nor HashFast's public comments

17   indicated that refunds, if necessary, would be paid in U.S. Dollars. In fact, HashFast represented

18   that refunds would be paid in Bitcoin and Morici relied on such representations. In a public post

19   on Bitcoin Talk made on August 10, 2013, the day Mr. Morici placed his order, Barber advised

20   that "Orders are taken in BTC, in the unlikely event we get to refunds they will be given in

21   BTC."  Attached as **Exhibit F** hereto is a true and correct copy of this post. The post may also

22   be viewed at: https://bitcointalk.org/index.php?topic=270384.msg2903338#msg2903338.

23   Another customer was also advised specifically that refunds would be paid in BTC. Attached as

24   **Exhibit G** hereto is a true and correct copy of this post. The post may also be viewed at:

25   https://bitcointalk.org/index.php?topic=262052.msg3452898#msg3452898.

26         44.    As with the delivery deadline, HashFast had no intention of fulfilling this

27   promise and knew they could not, as the Bitcoin that HashFast received from purchasers were

1    being paid out by HashFast to third parties, including manufacturers. In other words, HashFast

2    did not retain any of the Bitcoin it received in order to ensure that it would have the ability to

3    refund customers in Bitcoin. Rather, in order for HashFast to be able to honor its promise to

4    refund Bitcoins, it would have to go out and purchase it on the open market, but it would not

5    have the funds necessary to do so.

6            45.    Mr. Morici confirmed his order via email that day and paid a deposit in the

7    amount of 110.647885 BTC. On August 15, 2013, in response to a follow-up query from Mr.

8    Morici, HashFast advised that "[the] transaction successfully went through, and your order has

9    been complete."

10          46.    On August 19, 2013, nine days after Mr. Morici placed his order, HashFast sent

11   an "order confirmation" to Mr. Morici via email. The "order confirmation" contained additional

12   terms regarding the delivery date, and also contained an attachment, on a separate page, with

13   further "terms and conditions."  The email to Mr. Morici transmitting the order confirmation did

14   not reference the additional terms of the "order confirmation," nor did the email indicate that

15   further "terms and conditions" were attached to the order confirmation. Mr. Morici did not

16   review any of these additional terms or agree to these terms.

17          47.    Mr. Morici's order was order number M002, which, according to a list posted by

18   HashFast on the Site (at http://hashfast.com/order-chain/), placed him in "Batch 1" of the

19   customers who ordered the BabyJet (*i.e.*, these customers would be the first to receive the

20   BabyJet).

21          48.    As HashFast is undoubtedly aware, Bitcoin mining computers lose their value at

22   a rapid rate due to the fact that more powerful computers are needed to effectively "mine" for

23   Bitcoins as time goes on. Cognizant of this, Mr. Morici placed his order with the expectation

24   and understanding that his computers would be delivered in October. Indeed, to Mr. Morici, this

25   was a critical term of the transaction.

26   **THE MINER PROTECTION PROGRAM AND VAGUE SPECIFICATIONS**

27          49.    Mr. Morici's order was covered by what HashFast calls its "Miner Protection

Program" (MPP) (https://hashfast.com/miner-protection-program/), which HashFast announced on August 13, 2013, and agreed to provide retroactively to all purchases of Batch 1 BabyJets. The MPP ostensibly provided that if a purchaser did not break even in Bitcoin terms (through mining) within ninety (90) days after receiving their order, HashFast would automatically supply the purchaser up to 400% more hashing power in the form of "modules."  A module, in Hashfast's parlance, is one of Hashfast's chips on a printed circuit board, to be used in connection with the BabyJet mining computer.

50.     HashFast's rollout of the Miner Protection Program is further evidence of its understanding that the timing of shipment of the product was critically important. Given that the design and production of the BabyJet was funded with monies fraudulently raised via sales of as yet unproduced units, it was critically important to the funding scheme that early purchasers not seek refunds based on delivery failures prior to the completion of the first production run.

51.     In light of delays in fulfilling customer orders, HashFast modified the terms of the MPP, representing that they would start the ninety day clock for the MPP as if they had shipped their products by their originally advertised October 30, 2013 shipping date. In other words, HashFast agreed to give all customers similarly situated to Mr. Morici four additional modules some time after February 1, 2014, if the customers did not break even through their mining activities.

52.     In product specifications published on the Site prior to Mr. Morici placing his order, HashFast stated that the BabyJet contained a chip capable of processing at a speed of 400 Gh/s (400 billion hashes per second) while consuming 1 watt per Gh/s. Subsequently, after testing, HashFast stated that the chip contained in the BabyJet could run at up to 500 Gh/s. However, it wasn't clear what the power consumption was at that speed, or if that speed was sustainable without over heating during 24/7 operation.

53.      While processing speed is obviously important, power consumption also matters because at some point, as the Bitcoin computer produces less and less Bitcoin each month, the USD value of the Bitcoin being produced is less than the cost of electricity required to operate

1   the Bitcoin computer. For example, at the then-current Bitcoin exchange rate, the BabyJet

2   computer would have become unprofitable in late 2014.

3   54.   Additionally, despite promises to do so, HashFast delayed and never released the

4   full specifications for the product.

5   **POST-ORDER FALSE ASSURANCES**

6   55.   Following placement of Mr. Morici's order, HashFast continued to reaffirm that

7   it would make deliveries in October. These assurances, among other things, induced other

8   customers to purchase, but also induced existing customers, such as Morici, to refrain from

9   seeking refunds based on fears around HashFast's inability to fulfill its delivery dates. Despite

10  the knowledge that it would not meet promised delivery dates, HashFast, and in particular

11  Barber and deCastro, continued to make public assurances of delivery and to accept orders for

12  BabyJet units.

13  56.   On August 11, 2013, HashFast stated in a post on Bitcoin Talk: "[w]e understand

14  the importance of schedule . . . and we're confident we can deliver."  Attached as **Exhibit H**

15  hereto is a true and correct copy of this post. The post can also be viewed at:

16  https://bitcointalk.org/index.php?topic=262052.msg2908364#msg2908364.

17  57.   Also on August 11, 2013, in a post on Bitcoin Talk, a poster posited that if

18  HashFast ended up shipping in December, rather than October, HashFast's customers would

19  "take a bath."  In response, Mr. deCastro stated "we wont," and also stated that HashFast would

20  "protect" its customers "against hashrate increases."  Attached as **Exhibit I** hereto is a true and

21  correct copy of this post. The post can also be viewed at:

22  https://bitcointalk.org/index.php?topic=262052.msg2909687#msg2909687.

23  58.   On August 18, 2013, in response to a pointed question on Bitcoin Talk from a

24  customer as to whether "the expected ship date of late October still look[ed] achievable?" John

25  Skrodenis of HashFast responded "Yes. We are exactly on track."  Attached as **Exhibit J** hereto

26  is a true and correct copy of this post. The post may also be viewed at:

27  https://bitcointalk.org/index.php?topic=276827.msg2954679#msg2954679.

59.     A few days later, deCastro posted an entry titled "Countdown to Tapeout" to the HashFast blog. This post similarly conveyed (falsely) that HashFast was on schedule to deliver the BabyJets as planned. Attached as **Exhibit K** hereto is a true and correct copy of this post. A copy of this post can be found at this link: <http://hashfast.com/countdown-to-tapeout/>.

60.     On October 9, 2013 Barber made a blog post falsely stating that the production schedule was on track. Attached as **Exhibit L** hereto is a true and correct copy of this post. A copy of this post can be found at this link: <http://hashfast.com/contact-2/>.

61.     Nevertheless, on October 23, 2013, HashFast informed Mr. Morici via email that his initial order would be delayed because one of HashFast's vendors allegedly had not supplied it with certain components necessary to produce the products in question. This came as a surprise to Mr. Morici, because HashFast represented at the time Mr. Morici placed his order that it had a sufficient number of units of the BabyJet mining computers "in-stock," with shipments starting "October 20-30."  Additionally, Mr. Morici had been advised during a phone call with Mr. Skrodenis, HashFast's Vice President, and by HashFast's principals repeatedly on Bitcoin Talk, that there would be no slippage in the delivery dates. Based on those representations, Mr. Morici reasonably believed that the order would ship by no later than October 30th.

**DELAYS AND MORICI'S ATTEMPTS TO CANCEL AND OBTAIN A REFUND**

62.     Though HashFast's October 23, 2013 email to Mr. Morici goes on to admit that "time is money," HashFast informed Mr. Morici that his shipment would not be delivered by late October, but instead would be delivered in mid-November.

63.     HashFast failed to deliver to Mr. Morici his initial order in October as promised, and incredibly, on November 7, 2013, HashFast sent Mr. Morici yet another email informing him that his order would not be shipped until mid-December.

64.     None of the email notices sent by HashFast contained any reference to Mr. Morici's cancellation or refund rights.

65.     As HashFast itself has admitted in its marketing material, in email

correspondence with Mr. Morici, and in posts at Bitcoin Talk, the value of a Bitcoin mining computer decreases as time goes on. Realizing that the BabyJet Bitcoin computers he ordered would be of considerably less value in light of the new estimated delivery date (which apparently was a moving target), and more troubling, having legitimate concerns that he had been defrauded, at 3:42 PM on November 11, 2013, Mr. Morici sent an email to HashFast canceling his order and requesting a full refund of his deposit (in BTC, as agreed to by HashFast).

66.   HashFast did not respond to Mr. Morici's refund request until over a month later.

67.   On December 27, 2013, HashFast sent out an email to its customers, including Mr. Morici, stating that they expected to be "on track to ship . . . orders December 31." However, on December 29, 2013, HashFast sent out a follow-up email stating that they were "kicking off . . . shipments in the next few days," but customers who were interested in refunds could initiate refunds and be paid U.S. Dollars calculated at the Bitcoin exchange rate on the date of the refund. The offer of refund in U.S. Dollars came as a surprise to Mr. Morici, given the assurances and agreement of HashFast that refunds would be made in BTC.

68.   On December 31, 2013, HashFast sent out another email to Mr. Morici, advising that HashFast had "hoped to resolve reliability issues sooner so that [HashFast] could begin bulk production and be on track to ship Batch 1 customer orders on December 31." Unfortunately, the email continued, stating that "the issues have not been adequately resolved, and therefore [HashFast is] unable to ship the remaining outstanding orders by December 31st."

69.   Attached to HashFast's December 31st email was a detailed and onerous release form purporting to require, as a condition of obtaining a refund, among other things, a promise to not "disparage, libel, or criticize [HashFast] or publish any statement concerning [HashFast] this is critical."

70.   HashFast purported to ship an item to Morici, but the shipment was partial, and in any event, came too little too late. Given the more than two month delay in shipment, Mr. Morici cancelled the order. To date, HashFast has failed to provide Morici the refund in Bitcoin

that he was promised. However, HashFast did provide Lowe, with whom it had an arrangement to promote HashFast, a refund.

**UNJUST ENRICHMENT OF BARBER AND DECASTRO**

71.     Barber and deCastro were the controlling shareholders of HashFast LLC. Under their direction, HashFast Technologies channeled funds fraudulently raised through the sale of BabyJets from HashFast Technologies to HashFast LLC.

72.      HashFast LLC licensed the intellectual property related to the G1 to HashFast Technologies for the amount of $85,000 per month. This licensing fee was paid by HashFast Technologies to HashFast LLC using the proceeds from sales of purportedly complete BabyJet units even before the G1 chip had been completely designed.

73.     In December 2013, despite the fact that HashFast faced severe cash flow difficulties, multiple demands for refunds and impending litigation, Barber and deCastro used the proceeds from sales of still undelivered BabyJet units to take salary bonuses. Barber's salary was also *increased* at this time.

<u>**FIRST CLAIM FOR RELIEF – AGAINST THE ENTITY DEFENDANTS**</u>

(Breach of Contract)

74.     Morici realleges and incorporates by reference all preceding paragraphs of the Complaint.

75.     Morici's order placed via telephone on August 10, 2013, was an enforceable agreement which required delivery of two BabyJets by no later than October 30, 2013.

76.     HashFast was aware of the time-sensitive nature of the delivery date for the product and made specific assurances to Mr. Morici regarding the delivery deadline. HashFast's failure to deliver the product by its advertised delivery date is a material breach of the agreement.

77.     Morici has been damaged by HashFast's actions and is entitled to be compensated for any resulting damages, or alternatively, is entitled to a refund (in BTC) as per the terms of the contract, or to rescind the contract and receive restitution.

**SECOND CLAIM FOR RELIEF – AGAINST ALL DEFENDANTS**

(Fraud)

78.     Morici realleges and incorporates by reference all preceding paragraphs of the Complaint.

79.      Through their participation in the negotiations with Uniquify regarding the development of the G1 chip, Barber and deCastro knew that BabyJets could not be delivered to HashFast customers until, at the earliest, mid-November 2013. Despite this, Barber and deCastro themselves, and representatives of Hashfast, acting under the direction or supervision of Barber and deCastro, made statements falsely claiming that (1) BabyJets were in stock as of August 10, 2013, and that delivery of BabyJets would be made in October 2013; and (2) refunds would be provided in Bitcoin.

80.     Representatives of Hashfast, acting under the direction and control of Barber and deCastro, also made statements that misrepresented the computing power of BabyJets, and the efficacy of the MPP.

81.     Hashfast, Barber and deCastro knew the statements were false at the time they were made and that the false statements would induce customers, including Morici, to place orders for BabyJets.

82.     Morici relied on the statements to his detriment and his reliance was reasonable.

83.     Morici has been damaged as a result of such reliance and should be compensated for any injury suffered by him.

**THIRD CLAIM FOR RELIEF – AGAINST ALL DEFENDANTS**

(Violation of Cal. Bus. & Prof. Code §17200, *et seq.*)

84.     Morici realleges and incorporates by reference all preceding paragraphs of the Complaint.

85.     The acts and practices of HashFast as alleged herein constitute unlawful business acts and practices within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq.* HashFast has engaged in unlawful business acts and practices as alleged above, but in particular by (1)

making misleading statements regarding the availability and delivery dates for BabyJets and regarding the applicable refund policy; (2) violation of Cal. Civ. Code § 1723, which requires merchants to "conspicuously" display any no-refund policies, and to provide refunds to customers who attempt to return goods within 30 days of purchase; and (3) failing to provide Morici with the option to consent to a delayed shipping date or cancel his order, in violation of 16 C.F.R. § 435.2.

86. Barber and deCastro personally participated in the foregoing activities, for example by making misrepresentations regarding the delivery deadline and refund terms for the BabyJets (while knowing that these deadlines and terms would not be satisfied), implementing the scheme to fund production using orders that they knew HashFast could not timely fulfill, and enriching themselves using the sales proceeds from customers who were deceived as to delivery dates, and by failing to provide Morici the refund as promised and required by law. Barber and deCastro also participated in all aspects of HashFast's sales operations, and were responsible for statements made on the HashFast website and via online fora, and for HashFast's decision to decline to grant refunds as required under the law.

87. HashFast's actions have caused Morici damage.

88. HashFast, and Barber and deCastro in their personal capacity, have been unjustly enriched and have received the benefit of funds paid by Morici to HashFast. HashFast, and Barber and Morici individually should be required to make restitution to Morici pursuant to Cal. Bus. & Prof. Code § 1723 and § 17200.

## FOURTH CLAIM FOR RELIEF – AGAINST THE ENTITY DEFENDANTS

### (Declaratory Relief)

89. Morici realleges and incorporates by reference all preceding paragraphs of the Complaint.

90. Although HashFast and Morici are parties to a contract, HashFast has at several turns attempted to impose onerous terms on Morici. Specifically, HashFast denied Morici's right to cancel his order and receive a refund.

91.     Specifically, although state and federal law require HashFast to provide Mr. Morici with a full refund due to HashFast's failure to timely deliver the product, HashFast attempted to condition Mr. Morici's request for a refund on numerous additional terms, including a release of claims, a refund amount that calculates the amount of the refund in then-current Bitcoin exchange rates, and a promise to not make any critical statements about HashFast.

92.     Mr. Morici is entitled to a declaration that these terms are unenforceable and contrary to state and federal law.

## PRAYER FOR RELIEF

Morici requests entry of judgment as follows:

a.     Damages proximately flowing from HashFast's breach of the agreement;

b.     At Mr. Morici's election, rescission of the agreement;

c.     Damages and all other available remedies caused by Defendants' fraudulent and misleading statements;

d.     Restitution and other relief available under Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

e.     A declaration that the additional terms HashFast has attempted to impose on Morici in order to obtain a refund are unlawful and unenforceable;

f.     An order requiring HashFast to place Morici in the same position as he would have been prior to placing the order;

g.     Damages to be entered in BTC, as the operative currency for the transaction and as per the parties' understanding;

h.     An order that the principals of HashFast are personally liable for any award against HashFast; and

i.     Other and further relief, in law or equity, that the Court may deem appropriate and just.

Dated: March 16, 2015

Respectfully submitted,

FOCAL PLLC

By: s/Venkat Balasubramani
    Venkat Balasubramani (SBN 189192)

800 Fifth Ave, Suite 4100
Seattle, WA 98104
Phone: (206) 529-4827
Fax: (206) 260-3966
Email: venkat@focallaw.com

*Attorneys for Plaintiff*
PETE MORICI