Venkat Balasubramani (SBN 189192)
FOCAL PLLC
800 Fifth Ave, Suite 4100
Seattle, WA 98104
Phone: (206) 529-4827
Fax:    (206) 260-3966
Email: venkat@focallaw.com
Attorneys for Plaintiff
PETE MORICI

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| PETE MORICI, an individual,<br><br>                 Plaintiff,<br>       v.<br><br>HASHFAST TECHNOLOGIES LLC, a California limited liability company, HASHFAST LLC, a Delaware limited liability company, SIMON BARBER, an individual, and EDUARDO deCASTRO, an individual,<br><br>                 Defendants. | Case No. 14-cv-00087-EJD<br><br>**PLAINTIFF PETE MORICI'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ENTRY OF DEFAULT JUDGMENT AGAINST DEFENDANT EDUARDO DECASTRO**<br><br>**NOTED FOR HEARING: January 21, 2016 at 9:00am** |

**TABLE OF CONTENTS**

**I. Introduction** ........................................................................................................................1

**II. Background** .......................................................................................................................**1**

   A.  Factual Background.......................................................................................................1

      1.  Bitcoin Background..................................................................................................1

      2.  HashFast Entities Background .................................................................................1

      3.  deCastro's Fraudulent Conduct ................................................................................2

   B.  Procedural Background ................................................................................................4

**IV. Argument**...........................................................................................................................**5**

   A.  Default Judgment Standards - Application of the Eitel Factors ..............................5

      1.  First Eitel Factor: There is a Possibility of Prejudice...............................................5

      2.  Second and Third Eitel Factors: Morici's Substantive Claims Have Merit and the
          Amended Complaint is Sufficient. ..........................................................................6

      3.  Fourth Eitel Factor: The Sum of Money at Stake is Reasonable .....................................6

      4.  Fifth Eitel Factor:  Facts Are Not In Dispute. ..................................................................7

      5.  Sixth Eitel Factor: There is No Excusable Neglect. ..........................................................7

      6.  Seventh Eitel Factor: Deciding the Case on the Merits is Impossible ..............................7

   B.  Calculation of Damages ................................................................................................8

      1.  Damages for Breach of Contract. ...........................................................................8

      2.  Damages for Lost Profits.........................................................................................9

**V. Conclusion**...........................................................................................................................**10**

# TABLE OF AUTHORITIES

**Cases**

*Bd. of Trs. of the Boilermaker Vacation Trust v. Skelly, Inc.*
   389 F. Supp. 2d 1222, 1226 (N.D. Cal. 2005) ................................................................ 12

*Compania Engraw Com'l E. Ind. v. Schenley Dist. Corp.*
   181 F.2d 876, 879 (9th Cir. 1950) .................................................................................. 13

*Deutsche Bank v. Humphrey*
   272 U.S. 517 (1926) ........................................................................................................ 13

*Dr. JKL Ltd. v. HPC IT Educ. Ctr.*
   749 F. Supp. 2d 1038, 1048 (N.D. Cal. 2010) ................................................................ 10

*EEOC v. Recession Proof United States Llc*
   2013 U.S. Dist. LEXIS 171524, *11 (D. Ariz. Aug. 19, 2013) ...................................... 11

*Eitel v. McCool*
   782 F.2d 1470, 1471-72 (9th Cir. 1986) ............................................................ *in passim*

*Evergreen Marine Corp. (Taiwan) v. Thuan Loi Shipping*
   2015 U.S. Dist. LEXIS 125196 (C.D. Cal. Sept. 18, 2015) ............................................ 10

*Geddes v. United Fin. Grp.*
   559 F.2d 557, 560 (9th Cir. 1977) ............................................................................. 9, 11

*Glendale Fed. Sav. & Loan Ass'n. v. Marina View Heights Dev. Co.*
   66 Cal. App. 3d 101, 145-146 ........................................................................................ 14

*Hernandez v. Martinez*
   2014 U.S. Dist. LEXIS 112405, *14-15 (N.D. Cal. Aug. 13, 2014) .............................. 10

*Hicks v. Guinness*
   269 U.S. 71 (1925) .......................................................................................................... 13

*In re Good Hope Chem. Corp.*
   747 F.2d 806, 809-12 (1st Cir. 1984) ............................................................................. 13

*Jamaica Nutrition Holdings v. United Shipping*

1        643 F.2d 376, 379-81 (5th Cir. 1981) ................................................................................ 13

2    *Kloepping v. Fireman's Fund*

3        1996 U.S. Dist. LEXIS 1786 (N.D. Cal. Feb. 14, 1996) ............................................... 12

4    *Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*

5        235 Cal. App. 3d 1220, 1254, 1 Cal. Rptr. 2d 301, 321 (1991) .................................... 14

6    *Levi Strauss & Co. v. Aetna Cas. & Sur. Co.*

7        184 Cal. App. 3d 1479, 1486-87, 237 Cal. Rptr. 473, 477 (1986) ............................... 13

8    *Newmont Mines Ltd. v. Hanover Ins. Co.*

9        784 F.2d 127, 130-132, 138 (2d Cir. 1986) .................................................................. 13

10   *Pao Ch'en Lee v. Gregoriou*

11       50 Cal.2d 502, 505, 326 P.2d 135 (1958) ..................................................................... 14

12   *PepsiCo Inc. v. Cal. Sec. Cans*

13       238 F. Supp. 2d 1172, 1175-77 (C.D. Cal. 2002) ................................................... 11, 12

14   *Stout v. Turney*

15       22 Cal.3d 718, 729-30 (1978) ....................................................................................... 14

16   *TeleVideo Sys., Inc. v. Heidenthal*

17       826 F.2d 915, 917-18 (9th Cir. 1987) ....................................................................... 9, 12

18   *Truong Giang Corp. v. Twinstar Tea Corp.*

19       2007 U.S. Dist. LEXIS 100237, at *33 (N.D. Cal. Mar. 22, 2007) .............................. 11

20   *Vishipco Line v. Chase Manhattan Bank*, N. A.

21       660 F.2d 854, 865-66 (2d Cir. 1981) ............................................................................ 13

22   **Statutes**

23   CAL. BUS. & PROF. CODE § 17200, *et seq.* .............................................................................. 9, 10

24   FED. R. CIV. P. 55(b) ........................................................................................................ 5, 9, 12

25

26

27

# I. Introduction

Plaintiff Pete Morici ("Morici") hereby respectfully requests the Court to enter a Default Judgment for damages against Defendant Eduardo deCastro ("deCastro") pursuant to FED. R. CIV. P. 55(b). This Motion is supported by the Declarations of Pete Morici and Venkat Balasubramani.

# II. Background

**A. Factual Background**

*1. Bitcoin Background*

Bitcoin is a peer-to-peer payment network that uses digital currency known as "Bitcoin" (abbreviated as "BTC"). The Bitcoin network is decentralized, with no authority overseeing its operation, and uses open-source encryption software for transactions. Every Bitcoin transaction is permanently recorded and is maintained in a transparent public ledger. The original technical paper describing Bitcoin can be found here: http://bitcoin.org/bitcoin.pdf. (Declaration of Plaintiff Pete Morici in Support of Plaintiff's Motion for Entry of Default Judgment Against Defendant Eduardo deCastro ("Morici Decl."), ¶ 2.) Payment transactions are processed by a network of private computers distributed throughout the world which, typically, have been specially configured for processing Bitcoin transactions. These computers are commonly referred to as "Bitcoin computers," and the operators of such computers are known as "miners." Miners are compensated for the work they perform by receiving fees for the Bitcoin transactions that they process through their Bitcoin computers. (Morici Decl., ¶ 3.)

*2. HashFast Entities Background*

HashFast was an operation set up by deCastro and Simon Barber ("Barber"), the original founders. They set up two HashFast entities: HashFast LLC, which would hold the intellectual property, and HashFast Technologies, which would conduct business operations. deCastro exercised control over all aspects of HashFast's business in his position as Chief Executive Officer (as well as through being a majority equity owner, exerting financial control, and otherwise having veto power over corporate decisions). (Morici Decl., ¶ 4.)

1  deCastro was intimately involved in the daily operations of HashFast, including, but not
2 limited to: the raising of operating capital; procurement of material; setting production and
3 distribution schedules; negotiating contracts with third-party vendors; and overseeing and
4 implementing marketing plans. He tracked vendor activity closely, making joint decisions to
5 approve invoices and designating which HashFast entity paid the invoices. deCastro also
6 managed and directed the efforts of more than forty employees. He had knowledge of supply
7 chain timing for BabyJet components because he managed all of the engineering resources,
8 reviewed work, and approved invoices. (Morici Decl., ¶ 5.)

9      3.     <u>*deCastro's Fraudulent Conduct*</u>

10  HashFast was capitalized with a total of $641,643 USD, a number that was grossly
11 inadequate to undertake production and development of Bitcoin mining equipment (which would
12 cost several millions of dollars). Nonetheless, deCastro solicited customer orders for Bitcoin
13 equipment and, using the funds received from customers, paid vendors and other third parties
14 who would ultimately produce the machines. (Morici Decl., ¶ 6.)

15  For example, deCastro was privy to the negotiations with one such third party, Uniquify,
16 as well as the resulting statement of work agreement ("SOW I") between HashFast and Uniquify,
17 and therefore knew that HashFast would not be able to provide BabyJets until, at the earliest,
18 sometime in mid-November 2013. Indeed, HashFast and Uniquify shared office space and other
19 resources, and deCastro had personal knowledge regarding whether HashFast would be able to
20 meet its promised deadlines. Despite this knowledge, deCastro made and caused to be made
21 pointed assurances to prospective customers like Morici that the delivery date would be earlier
22 than was possible. (Morici Decl., ¶ 7.) In fact, he oversaw a wide-ranging marketing campaign
23 designed to assure prospective customers regarding HashFast's ability to timely deliver, all while
24 knowing that such delivery was impossible. For example, on August 5, 2013, deCastro caused
25 the following statement to be posted to Bitcoin Talk: "We will be shipping [the mining product]
26 in October." A screenshot of this statement may also be viewed at:
27

1  https://bitcointalk.org/index.php?topic=262052.msg2869011#msg2869011. (Morici Decl., ¶ 8,
2  Ex. A.)

3      At the time this statement was made, deCastro was aware that delivery in October 2013
4  was impossible given the timeline for development of the G1 chip agreed to in the Uniquify
5  SOW I. Despite this, HashFast employees—acting under the direction or supervision of
6  deCastro—made the false statements on Bitcoin Talk. deCastro knew that the false statements
7  would induce potential customers, including Morici, to purchase BabyJets, and the statements
8  were made for that purpose. (Morici Decl., ¶ 9.) Under deCastro's direction, HashFast even paid
9  at least one third party, Marc A. Lowe (a/k/a "Cypherdoc"), to promote HashFast on the Bitcoin
10 Talk forum and elsewhere, including specifically to quell customer concerns regarding
11 HashFast's ability to deliver as promised. deCastro also directly supervised John Skrodenis,
12 HashFast's head of sales, who similarly made numerous false and misleading marketing
13 statements and assurances. (Morici Decl., ¶ 10.)

14     On August 10, 2013, Morici visited the HashFast website in the course of deciding
15 whether to order a Bitcoin mining computer from HashFast. At that time, the Site advertised
16 (1) that HashFast had precisely 503 of 550 BabyJet units "in stock," and (2) that shipments of
17 BabyJets would occur by October 2013. These statements were false, as the G1 chip which was
18 to be used in the BabyJets had not even been fully developed at that time. The statements were
19 authorized by deCastro, who knew that the false statements would induce potential customers,
20 like Morici, to purchase BabyJets, and the statements were made for that purpose. Indeed, given
21 that deCastro had unique knowledge within the company of the delivery timeline and availability
22 (or lack thereof) of the BabyJets, such statements could only have originated with him or have
23 been made at his direction. In choosing the BabyJet, Morici relied on the above representations
24 regarding the availability and delivery dates of the BabyJets. (Morici Decl., ¶ 11.)

25     On the same day that he viewed the false statements regarding delivery dates on the
26 HashFast website, Morici ordered two BabyJets from HashFast at a total cost of $11,200 USD.
27 Despite the promise of free shipping, HashFast also charged Morici $307.38 USD for shipping,

PLAINTIFF'S MOTION FOR DEFAULT                                                Case No. 14-cv-00087-EJD
JUDGMENT AGAINST DECASTRO - 3

1  making the total transaction cost $11,507.38 USD. Payment on the transaction was to be made in
2  Bitcoin, with the cost amounting to 107.692308 BTC for the BabyJets and 2.95557692 BTC for
3  shipping, for a total of 110.67773274 BTC. Expecting to receive the shipment of BabyJets in
4  October 2013 as promised, on September 23, 2013, Morici ordered the BabyJet Upgrade Kit for
5  $3,158.57 (25.75691103 BTC). As of September 23, 2013, Morici's payments to HashFast
6  totaled 136.434643 BTC equating to $16,675.04 USD. (Morici Decl., ¶ 12.)
7         On November 11, 2013, after HashFast failed to deliver the BabyJets by the October
8  deadline, Morici sent an email to HashFast canceling his order and requesting a full refund of his
9  deposit (in BTC, as agreed to by HashFast). The value of one Bitcoin in United States Dollars on
10 November 13, 2013 was $332.54. (Source: www.coindesk.com/price/.) (Morici Decl., ¶ 13.)
11        On December 3, 2013, Morici's counsel sent a letter to HashFast outlining the unfair and
12 deceptive trade practices of HashFast and demanding an immediate refund of Morici's
13 136.40479603 BTC. The value of one Bitcoin in United States Dollars on December 3, 2013 was
14 $1,090.22. (Source: www.coindesk.com/price/.) To date, Morici has not received a refund of any
15 kind. (Morici Decl., ¶ 14, Ex. B.)
16        Morici also reasonably expected to make approximately 14 BTC in profit through the use
17 of the BabyJets, given that Bitcoin miners typically make 10 to 15 percent profit on the
18 investment made by purchasing Bitcoin mining computers. As a result of deCastro's actions,
19 Morici was unable to generate this expected profit. On December 3, 2013, the value of 14 BTC
20 would have equaled $15,389.08 USD. (Morici Decl., ¶ 15.)
21 **B.     Procedural Background**
22        Morici brought claims against the individual and HashFast entity defendants for breach of
23 contract, fraud, unfair business practices under CAL. BUS. & PROF. CODE § 17200, *et seq.*, and
24 declaratory relief on January 7, 2014. Defendants filed a motion to dismiss, seeking dismissal of
25 various claims. (Declaration of Venkat Balasubramani in Support of Plaintiff's Motion for Entry
26 of Default Judgment Against Defendant Eduardo deCastro ("Balasubramani Decl."), ¶ 2.) While
27 that motion to dismiss was pending, both HashFast entities entered bankruptcy proceedings, and

1   Defendants filed a notice of bankruptcy and suggestion for a stay as to all Defendants.
2   (Balasubramani Decl., ¶ 3.) The Court stayed this lawsuit as to all Defendants, but at Morici's
3   request granted relief from stay as to the Individual Defendants. (Balasubramani Decl., ¶ 4.) The
4   Court subsequently granted the Individual Defendants' motion to dismiss on the basis that the
5   initial complaint did not adequately specify which defendants made which misleading
6   statements. (Balasubramani Decl., ¶ 5.) Morici filed an Amended Complaint against Defendants
7   deCastro and Barber on March 16, 2015. (Balasubramani Decl., ¶ 6.) Despite having notice of
8   the ongoing proceedings, deCastro failed to answer or otherwise respond to the Amended
9   Complaint (Balasubramani Decl., ¶ 7, Ex. A), and on April 17, 2015, the Court entered an Order
10  of Default against deCastro. Morici has since resolved his claims against Barber, which claims
11  have been or shortly will be dismissed by Morici. (Balasubramani Decl., ¶ 8.)

### III. Argument

FED. R. CIV. P. 55(b)(2) permits the Court to enter final judgment following a defendant's default. Upon default, the factual allegations of the complaint, except those relating to the amount of damages, are taken as true. *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987) (quoting *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977)). Factors which may be considered by courts in exercising discretion as to the entry of a default judgment include: (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

**A.   Default Judgment Standards - Application of the *Eitel* Factors**

   *1.   First Eitel Factor: There is a Possibility of Prejudice.*

Under the first *Eitel* factor, the Court considers the possibility of prejudice to a plaintiff if default judgment is not entered against a defendant. *See Hernandez v. Martinez*, 2014 U.S. Dist. LEXIS 112405, *14-15 (N.D. Cal. Aug. 13, 2014); *Evergreen Marine Corp. (Taiwan) v. Thuan*

1  *Loi Shipping*, 2015 U.S. Dist. LEXIS 125196 (C.D. Cal. Sept. 18, 2015). Absent a default
2  judgment in this case, Morici will not be able to recover the full amount of damages to which he
3  is entitled, therefore, the first factor weighs in favor of granting default judgment.

4        2.    <u>Second and Third *Eitel* Factors: Morici's Substantive Claims Have Merit and the</u>
5                 <u>Amended Complaint is Sufficient.</u>

6       The second and third *Eitel* factors address the merits and sufficiency of Morici's claims
7  as pleaded in the Amended Complaint. These two factors are often analyzed together. *See Dr.*
8  *JKL Ltd. v. HPC IT Educ. Ctr.*, 749 F. Supp. 2d 1038, 1048 (N.D. Cal. 2010). In order to
9  establish his claims of breach of contract, fraud and violation of CAL. BUS. & PROF. CODE
10 § 17200, *et seq.*, Morici has provided substantial evidence that: (1) deCastro made false
11 statements regarding the delivery dates for the BabyJet; (2) Morici justifiably relied on those
12 false assurances; (3) deCastro and HashFast failed to deliver the BabyJets in accordance with the
13 false assurances; and finally, (4) Morici suffered harm as a result. In the Amended Complaint
14 Morici provides numerous examples of the fraudulent actions either overseen by deCastro or
15 personally undertaken by him. Morici's sufficient demonstration of his claims weighs heavily in
16 favor of default judgment.

17       3.    <u>Fourth *Eitel* Factor: The Sum of Money at Stake is Reasonable.</u>

18      Under the fourth *Eitel* factor, "the court must consider the amount of money at stake in
19 relation to the seriousness of Defendant's conduct." *PepsiCo Inc. v. Cal. Sec. Cans*, 238 F. Supp.
20 2d 1172, 1176 (C.D. Cal. 2002); *see also Eitel*, 782 F.2d at 1471-72. "The Court considers
21 Plaintiff's declarations, calculations, and other documentation of damages in determining if the
22 amount at stake is reasonable." *Truong Giang Corp. v. Twinstar Tea Corp.*, 2007 U.S. Dist.
23 LEXIS 100237, at *33 (N.D. Cal. Mar. 22, 2007), adopted by 2007 U.S. Dist. LEXIS 38642
24 (N.D. Cal. May 29, 2007). When the Court balances the amount of money at stake in a dispute in
25 relation to the seriousness of the defendant's conduct it considers "the seriousness of the
26 allegations and the need to deter such behavior in the future" to determine that the amount is not
27 necessarily excessive. *EEOC v. Recession Proof United States Llc*, 2013 U.S. Dist. LEXIS

PLAINTIFF'S MOTION FOR DEFAULT                                                      Case No. 14-cv-00087-EJD
JUDGMENT AGAINST DECASTRO - 6

1    171524, *11 (D. Ariz. Aug. 19, 2013). Here, deCastro participated in fraudulent activity that

2    ultimately affected not only Morici, but also other consumers who purchased the BabyJet. The

3    amount in controversy, $164,883 USD ($149,493.92 USD, which is equal to the value of

4    Morici's Bitcoin payments to HashFast on December 3, 2014 plus $15,389.08 USD, the value of

5    BTC lost as a result of the inability to use the machines in question) is proportionate to the need

6    to deter such fraudulent behavior.

7        4.    *Fifth Eitel Factor:  Facts Are Not In Dispute.*

8    The fifth *Eitel* factor considers the possibility that material facts may be in dispute. *Eitel*,

9    782 F.2d at 1471-72. When a defendant fails to respond to a complaint, the "defendant's liability

10   is conclusively established and all factual allegations of the complaint, except those relating to

11   damages, are assumed to be true." *Geddes*, 559 F.2d at 560.

12   Another court in the Ninth Circuit ruled that because the defendants had "failed to

13   respond in this action, and thus have not asserted that there are material facts in dispute, the

14   Court cannot adequately weigh this factor. Thus, this factor is neutral." *EEOC*, 2013 U.S. Dist.

15   LEXIS 171524 at *11. Here, deCastro has similarly failed to assert any dispute of the material

16   facts in the Amended Complaint and therefore, as in *EEOC*, this factor is neutral.

17       5.    *Sixth Eitel Factor: There is No Excusable Neglect.*

18   The sixth *Eitel* factor considers whether the default was due to excusable neglect. There

19   is no evidence that deCastro's refusal to appear or otherwise defend was the result of excusable

20   neglect. Rather, the record reflects that he made the conscious decision not to participate further

21   in this case after being served with the First Amended Complaint, apparently because he did not

22   accept the legitimacy of these proceedings. (*See* Balasubramani Decl., Ex. A.) Thus, the sixth

23   *Eitel* factor weighs in favor of default judgment.

24       6.    *Seventh Eitel Factor: Deciding the Case on the Merits is Impossible.*

25   The seventh *Eitel* factor addresses the Court's preference for deciding cases on the merits

26   whenever possible. However, the mere existence of FED. R. CIV. P. 55(b) indicates that "this

27   preference, standing alone, is not dispositive." *Kloepping v. Fireman's Fund*, 1996 U.S. Dist.

1  LEXIS 1786 (N.D. Cal. Feb. 14, 1996). Moreover, deCastro's failure to answer Morici's
2  Amended Complaint makes a decision on the merits impractical, if not impossible. Under FED.
3  R. CIV. P. 55(a), termination of a case before hearing the merits is allowed whenever a defendant
4  fails to defend an action. Thus, "the preference to decide cases on the merits does not preclude a
5  court from granting default judgment." *Pepsico*, 238 F. Supp. 2d at 1177 (quoting *Kloepping*,
6  1996 U.S. Dist. LEXIS 1786). Therefore, the seventh *Eitel* factor weighs in favor of default
7  judgment.

8  **B.     Calculation of Damages**

9    To recover damages after securing a default judgment, a plaintiff must prove the relief it
10 seeks through testimony or written affidavit. *Bd. of Trs. of the Boilermaker Vacation Trust v.*
11 *Skelly, Inc.*, 389 F. Supp. 2d 1222, 1226 (N.D. Cal. 2005); *see Pepsico*, 238 F. Supp. 2d at 1175
12 (citing *TeleVideo*, 826 F.2d at 917-18). Morici's Declaration sets forth the reasoning behind his
13 damages calculation of $164,883 USD as follows:

14   *1.     Damages for Breach of Contract.*

15   Bitcoin is a recent addition to the realm of international finance. Consequently, there is a
16 paucity of case law addressing the calculation of damages involving Bitcoin. It is therefore
17 instructive to refer to cases in which courts have determined damage valuations involving
18 foreign currencies. When the determination of damages requires the conversion of foreign
19 currency, courts generally apply either the judgment-day or the breach-day rule. *Levi Strauss &*
20 *Co. v. Aetna Cas. & Sur. Co.*, 184 Cal. App. 3d 1479, 1486-87, 237 Cal. Rptr. 473, 477 (1986)
21 (comparing *Hicks v. Guinness*, 269 U.S. 71 (1925); *Deutsche Bank v. Humphrey*, 272 U.S. 517
22 (1926)); *see generally*, *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 130-132, 138 (2d
23 Cir. 1986); *In re Good Hope Chem. Corp.*, 747 F.2d 806, 809-12 (1st Cir. 1984); *Vishipco Line*
24 *v. Chase Manhattan Bank*, N. A., 660 F.2d 854, 865-66 (2d Cir. 1981); *Jamaica Nutrition*
25 *Holdings v. United Shipping*, 643 F.2d 376, 379-81 (5th Cir. 1981); *Compania Engraw Com'l E.*
26 *Ind. v. Schenley Dist. Corp.*, 181 F.2d 876, 879 (9th Cir. 1950). However, if the plaintiff has a
27 cause of action under American law (rather than a cause of action under foreign law), the breach-

1  day rule applies, and the applicable rate is that prevailing when the cause of action arose. *See*
2  *Levi Strauss & Co.*, 184 Cal. App. 3d at 1487 (quoting *In re Good Hope Chem. Corp.*, 747 F.2d
3  at 810-12; *see also Jamaica Nutrition*, 643 F.2d at 379-81; *Compania*, 181 F.2d at 878-79
4  (breach of contract action between Argentine seller and California buyer; court holds that
5  California courts would apply breach-day rule). The reasoning that courts have applied to the
6  calculation of damages involving foreign currency should also be applied to the calculation of
7  damages involving Bitcoin.
8        Morici has adequately established three causes of action against deCastro under
9  California law. Therefore, damages should be calculated under the "breach-day" rule. In all,
10  Morici paid HashFast 136.40479603 BTC for the two BabyJets, the BabyJet Upgrade Kit, and
11  shipping. When HashFast failed to deliver the BabyJets by the promised October 2013 delivery
12  date, Morici made several attempts to cancel his order and request a refund. Morici paid
13  HashFast in Bitcoin and was assured that any refunds would also be tendered in Bitcoin. On
14  December 3, 2013, Morici made a final attempt to request a refund. HashFast both refused to
15  grant the refund and failed to deliver the BabyJets. December 3, 2013 is the date of the material
16  breach and damages should be calculated from that date. As of December 3, 2013, the value of
17  the Bitcoin paid by Morici to HashFast equaled $149,493.92 USD.
18        2.    *Damages for Lost Profits.*
19        CAL. CIV. CODE § 3343(a)(4) permits a victim of fraud to recover "an amount which will
20  compensate him for any loss of profits or other gains which were reasonably anticipated and
21  would have been earned by him from the use or sale of the property had it possessed the
22  characteristics fraudulently attributed to it by the party committing the fraud." Lost profits can be
23  awarded if the defrauded party acquired the property for profit, reasonably relied on the fraud,
24  and his damages were proximately caused by the wrongful conduct. *Las Palmas Assocs. v. Las*
25  *Palmas Ctr. Assocs.*, 235 Cal. App. 3d 1220, 1254, 1 Cal. Rptr. 2d 301, 321 (1991). A defrauded
26  party need not prove an "out-of-pocket" loss before seeking consequential damages. *Stout v.*
27  *Turney*, 22 Cal.3d 718, 729-30 (1978). But damages must be measured from the date the promise

PLAINTIFF'S MOTION FOR DEFAULT                                                                                    Case No. 14-cv-00087-EJD
JUDGMENT AGAINST DECASTRO - 9

is breached, not when the promise was made. *Las Palmas Assocs.*, 235 Cal. App. 3d at 1254 (quoting *Glendale Fed. Sav. & Loan Ass'n. v. Marina View Heights Dev. Co.*, 66 Cal. App. 3d 101, 145-146); *see also Pao Ch'en Lee v. Gregoriou*, 50 Cal.2d 502, 505, 326 P.2d 135 (1958).

Bitcoin miners can expect to make an approximate 10 percent profit on the investment made by purchasing Bitcoin mining computers. Had deCastro and HashFast not defrauded him, Morici could reasonably have expected to recover the cost of the BabyJets, as well as approximately 14 BTC in profit. On December 3, 2013, the date of material breach, damages for the value of the 14 BTC in lost profits proximately flowing from Morici's inability to use the machines in question, calculated in BTC would have equaled $15,389.08 USD.

### IV.     Conclusion

For the reasons set forth herein, Morici respectfully requests that the Court enter Judgment against deCastro in the amount of $164,883 USD.

Dated: November 13, 2015

Respectfully Submitted,

*s/Venkat Balasubramani*
Venkat Balasubramani, SBN #189192
FOCAL PLLC
800 Fifth Avenue, Suite 4100
Seattle, Washington 98104
Tel: (206) 529-4827
Fax: (206) 260-3966
Email: venkat@focallaw.com

*Attorneys for Plaintiff Pete Morici*